**SEALED**

# UNITED STATES DISTRICT COURT
for the
Western District of Virginia

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
AUG 14 2017
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

In the Matter of the Search of             )
*(Briefly describe the property to be searched*   )
*or identify the person by name and address)*    )    Case No. 3:17-mj-00040
                                            )
IN THE MATTER OF THE SEARCH OF INFORMATION  )
ASSOCIATED WITH (859)414-9660 THAT IS STORED )
AT PREMISES CONTROLLED BY NTELOS/SHENTEL    )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the ___Western___ District of ___Virginia___, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 249 | Willfully cause bodily injury to any person, or through the use of a dangerous weapon attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person |

The application is based on these facts:
SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*SA David Wolf*
*Applicant's signature*

David Wolf, Special Agent (FBI)
*Printed name and title*

Sworn to before me and signed in my presence.

Date: *August 14, 2017*

*/s/ Joel C. Hoppe*
*Judge's signature*

Joel C. Hoppe
*Printed name and title*

City and state: Charlottesville, VA

**SEALED**

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

AUG 14 2017

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRIGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH (859)414-9660 THAT IS STORED AT PREMISES CONTROLLED BY NTELOS/SHENTEL | Case No. 3:17-mj-00040<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent David Wolf, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by NTELOS/SHENTEL, a wireless provider headquartered at 500 Shentel Way, Edinburg, VA, 22824. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require NTELOS/SHENTEL to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2. I am a Special Agent assigned to the Federal Bureau of Investigation (FBI) and have been so employed for 4 years. I am empowered by law to investigate and make arrests for various federal offenses.

*Reviewed by Ronald M. Huber, AUSA 8-14-17*

3. I am currently assigned to the Richmond Division, Charlottesville Resident Agency and have received training in the investigation of both counterterrorism and criminal matters.

4. I have participated in and have experience in the investigation of various federal criminal violations, to include domestic and international terrorism, crimes against children, and civil rights violations.

5. I have also participated in searches, authorized by consent or by search warrant, of residences, commercial premises, vehicles, cell phones, and other locations for documentary evidence and packaging materials utilized in the trafficking of controlled substances and illegal contraband.

6. Through training and experience, your affiant has knowledge that domestic terrorists and persons affiliated with white supremacists groups and/or conspirators will utilize cell phones and other electronic devices to conduct their illegal activity and maintain contact with other confederates, conspirators and criminal associates involved with the planning, targeting, and execution of their political or social goals, to include – but not limited to – espousing violence.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code § 249, willfully

causing bodily injury to any person or, through the use of a dangerous weapon, attempting to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person, have been committed by JAMES ALEX FIELDS.

9. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

10. On August 12, 2017, a "Unite the Right" rally was held in Emancipation Park in Charlottesville, Virginia. The stated purpose of the rally was to protest the removal of the Robert E. Lee and Thomas "Stonewall" Jackson statues in Charlottesville, Virginia. Several groups were believed to be planning to attend to show their support for the event organizer, JASON KESSLER (hereafter referred to as "KESSLER"). Additionally, it was believed by law enforcement that several thousand counter-protestors would show up to voice their opposition to KESSLER and those in agreement with him. Throughout the course of the day, the event had several instances of violence between the two groups of protestors. At approximately noon, the rally was declared an unlawful assembly by the Charlottesville Police Department, and eventually the two groups dispersed to their own separate locations.

11. One of the groups observed by law enforcement at the aforementioned rally is the Vanguard Group, whose beliefs are stated as:

> *"The chains of debt slavery wrap themselves tight around White Americans, such conditions must be reversed. A new generation of corporate leaders, who hold the interests of White America first and foremost, will naturally rise to the top of this new economy."*

Below is a picture of the Vanguard America emblem taken from https://bloodandsoil.org/:



As noted above, the website for Vanguard is bloodandsoil.org. "Blood and soil" is derived from a German phrase, and it refers to a racist ideology that champions white supremacy.

### PROBABLE CAUSE

12. JAMES ALEX FIELDS has been identified as the operator of a grey Dodge Challenger, bearing Ohio license plate GVF1111, who on August 12, 2017 drove his vehicle into a crowd of African Americans, Black Lives Matter ("BLM") supporters, and other like-minded protestors, killing one Caucasian female and injuring approximately twenty other individuals of African-American and Caucasian descent. Based on your affiant's review of the video footage of the incident, your affiant believes that the vehicle was traveling at a high rate of speed intending to strike a group comprised of African Americans, Caucasians, and BLM supporters. After striking multiple victims with his vehicle, FIELDS then began to drive his vehicle backwards, in reverse, at high-rate of speed to flee the scene.

13. Your affiant knows from other law enforcement officers that FIELDS was dressed in a white polo shirt, khaki pants, and black shoes after his arrest at the Charlottesville Police Department. FIELDS' hair was trimmed with a "high and tight" or "side-fade" style consistent with the hairstyle of other individuals associated with the white supremacist group Vanguard

America at the rally. Below is a picture of FIELDS law enforcement obtained from social media at the Charlottesville "Unite the Right" rally. Fields is second person from the left with the large black shield in front of him.



14.     Your Affiant, knows from other law enforcement that FIELDS was the only person in the vehicle at the time of this incident. After the Charlottesville Police Officers arrested FIELDS, the vehicle was towed and stored in a secured law enforcement facility. Your affiant has observed a copy of the Ohio Motor Vehicle Registration which identifies FIELDS as the registrant and provides the address: 6853 Deer Ridge Road, Apartment 16, Maumee, Ohio, Lucas County. Your affiant knows from other law enforcement officers that FIELDS' mother SAMANTHA BLOOM is the current resident at the Deer Ridge Road address. During an

interview on August 12, 2017, BLOOM stated that FIELDS currently lives at the address 2423 Holland Sylvania Road S. Apt 219, Maumee, Ohio.

15. The Charlottesville Police Department obtained a Virginia State search warrant for this vehicle and collected one Samsung cellular phone lying on the front passenger seat. The cellular phone was plugged in to the outlet and would be accessible to the driver of the vehicle as seen below.



16. In my training and experience, I have learned that SPRINT and NTELOS/SHENTEL are companies that provide cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for SPRINT and NTELOS/SHENTEL subscribers may be located on

6

the computers of SPRINT and NTELOS/SHENTEL. Further, I am aware that computers located at SPRINT and NTELOS/SHENTEL contain information and other stored electronic communications belonging to unrelated third parties.

17. Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail. If the subscriber does not delete the message, the message may remain in the system of SPRINT and NTELOS/SHENTEL for weeks or months.

18. Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by SPRINT and NTELOS/SHENTEL for short periods incident to and following their transmission. In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

19. Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with

particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

20. Wireless providers may also retain text-messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

21. Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

22. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

23. In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

24. As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the data pertaining to a particular cellular device that is retained by a

9

wireless provider can indicate who has used or controlled the cellular device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time. Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cellular device owner. Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

25.     Your affiant has received advice from Federal Bureau of Investigation Special Agent David Church during this investigation. Special Agent Church routinely works with phone record analysis as part of his employment. Special Agent Church informed your affiant that it is often beneficial to review at least 60 days of records as they relate to call detail records. Your

affiant believes that this range of records will establish a pattern of life and behavior. A smaller collection of records would make it difficult to determine if it is unusual for the phone(s) to appear in the areas where these crime(s) occurred. Not only will this assist in determining if the phone(s) frequents the areas of the crime scene(s), but also whether the phone normally belongs in these areas because that is where the phone subscriber lives and/or works and potentially provide valuable evidence as to whom the user of the cellular telephone communicates and may have conspired with in the incidents described above.

26.     In addition, Special Agent Church informed your affiant that SPRINT and NTELOS/SHENTEL share cellular tower equipment within the Southwest Virginia region, which encompasses the Charlottesville, Virginia area. For this reason, it is necessary to request the items described in Attachment B from both cellular telephone providers, as some of the data requested may only be available from one of the providers.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

27.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require NTELOS/SHENTEL to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

28.     Based on the forgoing, I request that the Court issue the proposed search warrant.

11

29. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Western District of Virginia is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

30. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

31. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed pursuant to a separately filed motion for sealing. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

*SA David Wolf*
David Wolf
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _August 14_, 2017

_____
HONORABLE JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE

13